IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOHNA GONZALES,

               Plaintiff,

vs.

COUNTY OF TAOS and TAOS COUNTY
BOARD OF COMMISSIONERS,

               Defendants.

Case No: 17-CV-582-F

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on the Defendants' Motion for Summary Judgment. The Court has reviewed the motion, the response, heard oral argument, and is fully informed in the premises.

## I.     BACKGROUND

Plaintiff Johna Gonzales ("Gonzales") worked as the Detention Director for the Taos County Juvenile Detention Center from 2011 to 2013 and as the Director of Detentions (including both Adult and Juvenile Detentions) from August 21, 2013 to January 8, 2016, when she was terminated. In 2013, when she was hired as the Director of Detentions, the County paid Gonzales an hourly rate of $32.61. Prior to taking that position, Gonzales worked at McKinley County from 1995 to 2011, serving in various positions, but served as director for the Juvenile Detention Center for six years. In 2011, Gonzales took the position of Juvenile Detention Director for Taos County. As

previously noted, in 2013 she became director of both the adult and juvenile detention centers as part of a reorganization plan.

On March 6, 2015, Taos County Facilities Management Director Mark Flores reported to Taos County Human Resource Manager, Renee Weber, that Gonzales received an inappropriate text message from one of his employees. Gonzales did not report this text to HR, but reported it to Mr. Flores, the employee's supervisor.

Ms. Weber contacted Gonzales about the incident. Gonzalez confirmed the incident occurred and Ms. Weber investigated. The County disciplined the employee with a 30-day suspension and after his suspension ended he did not return to work.

On October 15, 2015, Leonardo Cordova became the Taos County Manager, replacing former manager Stephen Archuleta, who retired. On October 27, 2015, Cordova sent Gonzales a "Letter of Expectations" and also asked her to review and sign her position description. Gonzales signed her job description for Cordova, confirming that she was classified as Exempt and at a Pay Grade E5 on the Taos County pay scale, which was $32.61 per hour, or $68,828.00 per year.

On December 18, 2015 there was an incident in the detention center. Prior to this time, Gonzales had implemented "tier time" at the Adult Detention Center (ADC). Tier time allowed inmates on each of the two floors out of their cells at different times, but required them to be in their cells when the other floor was out. Gonzales implemented tier time based on safety concerns for officers and inmates because the facility was significantly understaffed. Prior to December 18, 2015, inmates were agitated about the use of tier time. On December 18, 2015, Detention Officer Matt Tafoya called a Code 1

2

at approximately 12:45 p.m. after discovering inmate Espejo's face was covered in blood. Tafoya called for the inmates in A pod to go on lockdown, but they refused. Lt. Brenda Zamora arrived to find the inmates yelling and saying they were not going to do tier time anymore. Both Lt. Zamora and Tafoya questioned Espejo, who claimed he had slipped and fell. An unidentified officer informed Gonzales that the inmates were refusing to go into lockdown and wanted to speak with her in the pod. Gonzales took 15-30 minutes to go back to speak to the inmates. When she arrived, the inmates were calm and quiet. Gonzales spoke to the inmates and agreed to abolish tier time.

On December 23, 2015, inmate Jonathan Lopez was assaulted and was transported to the hospital for treatment. Gonzales learned of the assault five days after it occurred, on December 28, 2015, when she returned to work after Christmas vacation.

Gonzales met with County Manager Cordova and Deputy County Manager Brent Jaramillo to discuss these issues on January 4, 2016. On January 8, 2016, Cordova terminated Gonzales. After her termination, Gonzales brought a complaint alleging several claims. Specifically, Gonzalez claims Retaliation in Violation of Title VII - Count One; Violation of New Mexico Human Rights Act -Count Two; 42 U.S.C. § 1983 Due Process Violation – Count Three; Title VII – Disparate Treatment – Count Four; Title VII – Hostile Work Environment- Count Five; Municipal Liability – Count Six; Breach of Employment Contract – Count Seven; Violation for the Fair Pay for Women Act – Count Eight; and Violation of the Equal Pay Act – Count Nine.

Defendants seek to dismiss all of Gonzales's claims. The Court will consider the claims in the order they were raised in the Defendants' Motion.

3

# DISCUSSION

## A. Summary Judgment Standard

Summary judgment is appropriate where the movant has demonstrated that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1207-08 (10th Cir. 2010). As a general matter, the summary judgment movant has the burden to produce evidence supporting its claims. *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010). If the movant does so, the burden of production shifts to the party opposing summary judgment to demonstrate a genuine issue of material fact exists. Id. At all times the Court must view the evidence in the light most favorable to the party opposing summary judgment. *Id.* at 1168. There is a genuine issue of material fact if a reasonable jury could find in favor of the non-moving party. *Id.* at 1169. In addition, the Court may only consider evidence that is admissible at trial, inadmissible evidence should be disregarded. *Johnson*, 594 F.3d at 1209. "It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment." *Gross v. Burggraf Const. Co.*, 52 F.3d 1531, 1541 (10th Cir. 1995) (citations omitted).

## B. Gonzales's Breach of Contract Claim- Count Seven.

Defendants claim Gonzales cannot prove her breach of contract claim because her employment was at will. Gonzales responds that she had an implied employment contract. This issue is governed by New Mexico law.

"The general rule in New Mexico is that an employment contract is for an indefinite period and is terminable at the will of either party." *Hartbarger v. Frank*

4

*Paxton Co.*, 857 P.2d 776, 779 (1993) (internal citation omitted). Either party can terminate an at-will employment relationship "at any time for any reason or no reason, without liability." *Id*. at 779 (internal citation omitted). An exception to this general rule exists where there is an implied contract. *Id*.

> This Court has upheld findings of an implied employment contract provision that restricted the employer's power to discharge where the facts showed that the employer either has made a direct or indirect reference that termination would be only for just cause or has established procedures for termination that include elements such as a probationary period, warnings for proscribed conduct, or procedures for employees to air grievances. See *Newberry v. Allied Stores, Inc.*, 108 N.M. 424, 427, 773 P.2d 1231, 1234 (1989) (upholding finding of implied contract based on employee manual, words, and conduct of parties); *Kestenbaum v. Pennzoil Co.*, 108 N.M. 20, 24–26, 766 P.2d 280, 284–86 (1988) (affirming finding of implied contract based on words and conduct of parties), cert. denied, 490 U.S. 1109, 109 S.Ct. 3163, 104 L.Ed.2d 1026 (1989); *Lukoski v. Sandia Indian Management Co.*, 106 N.M. 664, 667, 748 P.2d 507–510 (1988) (upholding finding of oral contract amended by employee handbook); *Forrester v. Parker*, 93 N.M. 781, 782, 606 P.2d 191, 192 (1980) (holding that, when terminating non-probationary employee, employer is bound by policies established in "personnel policy guide" that control the employer-employee relationship). We have upheld findings that there was no implied contract in cases where the alleged promise by the employer was not sufficiently explicit. See *Shull v. New Mexico Potash Corp.*, 111 N.M. 132, 135, 802 P.2d 641, 644 (1990) (affirming summary judgment in favor of employer where employee had no bargained-for expectations and employee handbook did nothing to alter at-will relationship); *Sanchez v. The New Mexican*, 106 N.M. 76, 79, 738 P.2d 1321, 1324 (1987) (affirming grant of directed verdict in favor of employer where language in employee handbook was of a non-promissory nature and was merely a declaration of employer's general approach to the subject matter discussed).

*Id.* at 779-780.

"Whether an employer's words and conduct support a reasonable expectation on the part of employees that they will be dismissed only in accordance with specified procedures or for specified reasons generally is a question of fact for the jury." *Mealand*

*v. E.N.M. Med. Ctr.*, 33 P.3d 285, 289 (2001). "[B]ecause an employee's expectation based on an employer's words or conduct must meet a certain threshold of objectivity, an employer may be entitled to judgment as a matter of law if the employee's expectations are not objectively reasonable." *West v. Wash. Tru Solutions, LLC*, 224 P.3d 651, 653 (Ct.App.2009). "In examining implied employment contract cases, we always have required that the promise that is claimed to have altered the presumed at-will term be sufficiently explicit to give rise to reasonable expectations of termination for good cause only." *Hartbarger*, 857 P.2d at 783.

In her response, Gonzales points to Taos County's policy of disciplining its non-classified employees prior to demotion or other adverse employment action and also claims City Manager Cordova believed that "at-will" Directors could only be demoted for cause. Missing from Gonzales's response is any specific statements to her or declarations in handbooks that she was provided indicating a promise by Taos County that she could only be terminated for cause. The only specific item Gonzales points to is the October 27, 2015 Letter of Expectations. Gonzales testified that she believed that if she did everything Cordova wanted in the letter that she would not be fired. (Doc. 45-1 at 31 [Gonzales depo. at 226]).

It is undisputed that Gonzales's July 29, 2011 offer of employment stated that Gonzales was hired for an unclassified "at-will" position. (Doc. 45-3). Additionally, Gonzales signed a "Unclassified Employment Agreement" on August 18, 2011, directing her to Section 2 and 2.6 of the Taos County Personnel Policy Manual. (Doc. 45-5). The Taos County Personnel Policy Manual and Union Contract provided information on the

different types of classifications and provides that "unclassified" positions are "terminable-at-will" and "not subject to the Fair Labor Standards Act." (Doc. 45-4 at 7 [Policy Manual at 2.6]). On August 27, 2014, Gonzales received a letter memorializing her position as the ADC/JDC Administrator and increasing her pay. (Doc. 45-7). This letter did not change her classification. On October 27, 2015, Gonzales received a "Letter of Expectations" from Cordova. The letter explicitly stated that Gonzales' position was an "exempt at will position", more importantly the letter did not indicate any form of progressive discipline or provide any promise of continued employment if Gonzales complied with the terms of the letter.

Gonzales also claims the County had a policy of providing discipline to unclassified employees prior to demotion or other adverse employment action. Cordova testified regarding two instances he had with department heads that had been written up or provided a chance to cure minor deficiencies. The Solid Waste Director Deward Martinez had two instances where he took his county vehicle home without prior approval and was given a write-up for those actions. (Doc. 53-2 at 7 [Cordova depo. at 166]). The other instance was a public works supervisor Earl Salazar, who also took county property home for personal use. (*Id.* [Cordova depo. at 168]). Both of these individuals were provided "guidance and coaching" as to county vehicles and when they could be taken home. (*Id.*). There were other issues with Salazar, he had problems with his chain of command and he was demoted to a position for which he was closer to being

qualified and which had a lower salary. (*Id.* at 8 [Cordova depo. at 172-73])[1]. However, he was later terminated after there was a substantiated claim of sexual harassment. (*Id.* at 9 [Cordova depo. at 177]).

However, Cordova testified that these employees were not subject to "progressive discipline" at the director level. Cordova also testified that during his tenure there were other firings, including the IT director and the EOM Coordinator and there was no indication of any process provided to those individuals. (*Id.* at 10-11 [Cordova depo. at 180-181]).

These examples do not provide sufficient evidence of county policy that at-will director employees could only be terminated for cause. There is no record evidence from these employees' files to show progressive discipline, the original terms of their employment or other information related to their employment. Rather, the only evidence is Cordova's testimony. Additionally, there is no evidence that Gonzales was aware of these employees' treatment prior to her termination to provide her a basis to believe her employment was not at-will, despite her signed employment agreement.

Gonzales also claims that Cordova did not believe he could fire her without cause. However, Cordova's actual statement was that he *wouldn't* have fired her for no reason, not that he *couldn't* fire her for no reason. (*Id.* at 11 [Cordova depo. at 184]).[2] Cordova

---

[1] It is worth nothing that there is no indication that Mr. Salazar received any due process related to his demotion and reduction in salary.

[2] During Cordova's deposition the following exchange took place:

    Q. And that's – when you talked about – when you started someone told you that there was at-will employment. Did that person also describe that at-will employees were to be terminated for a reason?"

    A. Yes.

    Q. And that that reasons would be something that would justify termination?

stated that his "understanding of the at-will was there's not a need for a process." (*Id.*). Even if Cordova's statements could have somehow created an implied employment contract, these statements were made during Cordova's deposition and were not statements he made to Gonzales prior to her termination that could be used as evidence of an implied contract.

Gonzales failed to identify any words or conduct by the County during her employment that would establish her expectation, that she could only be fired after being afforded due process, was objectively reasonable. She does not cite to any document or any statement made directly to her that would support a claim that she had an implied-in-fact employment contract.

For these reasons, Gonzales fails to establish any dispute of material fact that a reasonable jury could find she had an implied employment contract with the County. As a result, Gonzales's Claim in Count Seven for Breach of Employment Contract is DISMISSED.

### C. Gonzales's Right to Due Process – Count Three.

Gonzales also claims a violation of her Constitutional right to due process. "As a general principle of due process law, public employees with a legitimate expectation of continued employment are protected from termination without just cause, notice, and opportunity to be heard." *City of Albuquerque v. AFSCME Council 18 ex rel. Puccini,*

---

MR. EQUIVEL: Objection to the form of the question.
A. I have not fired anyone without a reason.

Gonzales points to this exchange as a statement of Taos County Policy that at-will employees could not be terminated without justification. However, the exchange does not create any such policy. Not firing an employee unless there is reason is different from firing an employee for just cause.

9

2011-NMCA-021, ¶ 11, 149 N.M. 379, 382, 249 P.3d 510, 513. To assert a claim for violation of her due process rights, Gonzales must establish that she had a protected property right in her continued employment. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, (1985). In considering whether a city employee had a right to continued employment, the Tenth Circuit has explained:

> Driggins claims that her right to continued employment with the City constitutes a property interest protected by the Fourteenth Amendment. Such a property interest "exists if state or local law creates 'a sufficient expectancy of continued employment.'" *Campbell v. Mercer*, 926 F.2d 990, 992 (10th Cir.1991) (quoting *Vinyard v. King*, 728 F.2d 428, 432 (10th Cir.1984)). The existence of a property interest is "defined by existing rules or understandings that stem from an independent source such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709; see also *Carnes v. Parker*, 922 F.2d 1506, 1509–10 (10th Cir.1991). The "sufficiency of the claim of entitlement must be decided by reference to state law." *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); see also *Vinyard*, 728 F.2d at 432.

*Driggins v. City of Oklahoma City, Okl.*, 954 F.2d 1511, 1513–14 (10th Cir. 1992). Thus, Gonzales's claim is governed by New Mexico law.

As previously noted, "[t]he general rule in New Mexico is that an employment contract is for an indefinite period and is terminable at the will of either party." *Hartbarger*, 857 P.2d at 779 (internal citation omitted). Either party can terminate an at-will employment relationship "at any time for any reason or no reason, without liability." *Id.* at 779 (internal citation omitted). "At-will employees lack a property interest in continued employment." *Darr v. Town of Telluride, Colo*, 495 F.3d 1243, 1252 (10th Cir. 2007) (citing *Bishop v. Wood*, 426 U.S. 341, 348 (1976).

As discussed above, Gonzales was hired as an unclassified, at-will employee. As her position changed, her classification never did. Even in her letter of expectations on October 27, 2015, Cordova reminded Gonzales that she was an "exempt at-will" employee. Gonzales fails to point to any evidence that would create a question of fact that she had a protected property interest in her continued employment. As a result, she was not entitled to due process prior to being terminated.

Gonzales claims she had a protected property right to the financial benefit that flowed from her employment. This argument also lacks merit. The cases cited by Gonzales do not stand for the proposition that any public employee receiving a salary is entitled to due process. Rather, the cases discuss whether the requirement for due process is triggered by holding a position, or by receiving the salary. In *Bd. of Educ. of Carlsbad Mun. Sch. v. Harrell*, 1994-NMSC-096, ¶ 22, 118 N.M. 470, 478, 882 P.2d 511, 519, the Court found a school board did not deprive the former superintendent of any property interest by suspending him with pay, because his "claim of entitlement to employment was satisfied so long as he continued to receive the full compensation due under his contract." The issues in *Harrell* are completely different from the issues in this case.

Gonzales claims she was entitled to the protections of the procedure set forth in the Taos County Disciplinary Policy. However, she fails to provide any basis for the Court to find that she would be entitled to protections under the policy. There is no question of fact that Gonzales was an unclassified, at-will employee. As a result, Gonzales did not have a protected property interest in her continued employment and she was not entitled to process prior to her termination.

Additionally, as the Court previously discussed, the County's actions related to other director-level employees did not create a reasonable expectation to continued employment.

For all these reasons, Gonzales's claim in Count Three – 42 U.S.C. § 1983 Procedural Due Process is DISMISSED.

### D. Title VII Claims for Retaliation (Count One), Disparate Treatment (Count Four), Hostile Work Environment (Count Five) and Violations of the New Mexico Human Rights Act (Count Two).

In Count One, Gonzales claims that after she reported sexual harassment, the County retaliated against her. In Count Four, Gonzalez claims Disparate Treatment in violation of Title VII. In Count Five, Gonzales claims hostile work environment in violation of Title VII. Based on the same conduct Gonzales also claims a violation of New Mexico Human Rights Act (NMHRA) in Count Two.[3]  The Court will address these issues separately.

### 1. Retaliation under Title VII (Count One) and NMHRA (Count Two)

In Count One, Gonzales claims that after she reported sexual harassment, Defendants engaged in retaliatory conduct.  As previously noted, on March 6, 2015, Taos County Facilities Management Director, Mark Flores, spoke to Taos County Human Resource Manager Renee Weber regarding a text Gonzales received from one of his maintenance employee.

Ms. Weber contacted Gonzales about the incident.  Gonzalez confirmed the incident occurred and Ms. Weber investigated.  The County disciplined the employee

---

[3] Gonzales's burden under the NMHRA is identical to her burden under Title VII, therefore the Court's analysis applies equally to both claims. *See Orr v. City Of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (citing *Cates v. Regents of the New Mexico Inst. of Mining & Tech.*, 124 N.M. 633, 638, 954 P.2d 65 (1998)).

with a 30-day suspension and the employee did not return to work. Gonzalez claims she was never told the outcome of the investigation.[4]

After Gonzales reported the incident, she claims that she was ostracized and isolated from her co-workers, told not to engage in ordinary work activities, which undermined the chain of command, and was ultimately terminated from her position.

To establish a prima facie case of retaliation, Gonzales must show she engaged in protected opposition to discrimination, the County took an adverse employment action against her, and a causal connection between the protected activity and adverse action exists. See *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 979 (10th Cir. 2008) (citing *Stover v. Martinez*, 382 F.3d 1064, 1070–71 (10th Cir. 2004)); see also *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

The Tenth Circuit defines adverse employment action as conduct that significantly changes an employee's employment status, including hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007). In contrast, conduct that has no more than a de minimus impact on the employee's future job opportunities is not an adverse employment action. *Hillig v. Rumsfeld*, 381 F.3d 1028, 1033 (10th Cir. 2004).

In her deposition, Gonzales stated that after the sexual harassment claim, then County Manager Stephen Archuleta would not come into her office and made her go out

---

[4] Defendants claim Gonzales was notified of the outcome of the investigation, but Gonzales claims she was not notified. For purposes of this motion, the Court accepts Gonzales's claim that she was not notified of the outcome of the investigation.

to the lobby under a camera to talk to him. (Doc. 53-1 at 10 [Gonzales depo. at 100-101]). She also claims that Mark Flores and the people who worked for him in the maintenance crew would keep their distance from her, they would stand farther away from her when they spoke to her. (*Id.*). Additionally, people no longer greeted her with a hug. (*Id.*). Brent Jaramillo, the Deputy County Manager, told her to be careful where she talked to people because it would look bad. (Doc. 53-1 at 11 [ Gonzales depo. at 102]). Additionally, Jaramillo told her not to take breaks in the plaza square of the County Courthouse and not to go to lunch with her staff, or if she did, to take a separate car. (*Id.*). Otherwise, Gonzales just felt there was a distance between her and the other employees and nothing else specific she could recall at that time of her deposition.[5] She also stated that her termination "could have been" a result of filing the complaint. (Doc. 53-1 at 11 [Gonzales depo. at 103]). Gonzales testified that she expressed these complaints to "Antonia and Brenda", who were both her subordinates. (*Id.* [Gonzales depo. at 103-104]). There is no indication that Gonzales raised these complaints with her supervisor or with HR.[6]

Even taking as true all of Gonzales' allegations regarding the behavior after she reported sexual harassment, with the exception of her termination, these allegations do not rise to a level of materially adverse employment actions. "The antiretaliation

---

[5] In her response, Gonzales also claims that she was accused of having an affair with a County Commissioner because she was sitting with him in a vehicle in the parking lot. (Doc. 53 at 24 [Pl. Response, citing UMF ¶ 116]. This allegation is supported by Gonzales's deposition testimony that there was an investigation because she was sitting in the vehicle of a County Commissioner, under a camera. (Doc. 53-1 at 10 [Gonzales depo. at 101]). However, it appears this allegation related to an event that occurred in July of 2012. (Doc. 45-6). Since this event occurred before the sexual harassment complaint, it cannot constitute retaliatory conduct.

[6] It is worth noting that at the time Stephen Archuleta, the subject of one of the complaints, was her supervisor. However, Gonzales's remaining complaints relate to her treatment by other employees. There is no indication that the County had notice of these complaints or these employees' actions.

14

provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). "We speak of material adversity because we believe it is important to separate significant from trivial harms." *Id.* An employee must show that challenged action would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (citations and quotation marks omitted). "[N]ormally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.*

While she claims these actions "undermined the chain of command" this is only a conclusory statement, unsupported by any evidence in this case. She does not state how Archuleta only talking to her in the lobby adversely affected her employment. The same is true for her allegations that maintenance workers stood further back from her when talking and that she was not greeted with hugs. These are "petty slights and minor annoyances" that do not rise to the level of deterring protected activity.

While Gonzales claims she was ultimately terminated in retaliation for her sexual harassment claims, she has failed to establish a causal connection between her termination and the sexual harassment complaint. A causal connection may be shown by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982). "Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation." *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (citing *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1395

(10th Cir. 1997)). "[W]e have held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation. By contrast, we have held that a three-month period, standing alone, is insufficient to establish causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citation omitted).

In this case the sexual harassment complaint was in March of 2015 and Gonzales's termination was in January of 2016, more than nine months later. Other than a distant temporal connection, Gonzales offers no evidence that her termination was in retaliation for her sexual harassment complaint. Cordova, who terminated Gonzales, became the City Manager in October of 2015, after the sexual harassment complaint. There is no evidence that he was even aware of the complaint or that he ever mentioned the complaint to Gonzales. Gonzales failed to establish any evidence that would create a genuine question of material fact that she was terminated in retaliation for her sexual harassment claim.

For all of these reasons, Gonzales's claim for Retaliation in Violation of Title VII – Count One and her claim under the NMHRA-Count Two are DISMISSED.

## 2. Hostile Work Environment (Count Five)

In Count Five, Gonzales claims Defendants created a hostile work environment based on her gender. "[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). "To establish [that] a sexually hostile work environment existed, a plaintiff must prove the following elements: (1) [she]

16

is a member of a protected group; (2) [she] was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment." *Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1262-63 (10th Cir. 2005). "The company, as opposed to the individual directly responsible for the misbehavior, is liable, on a negligence theory, if it knew or should have known about the conduct and failed to stop it." *Bertsch v. Overstock.com*, 684 F.3d 1023, 1027 (10th Cir. 2012) (citation and quotation marks omitted). As described by the Tenth Circuit in *Bertsch*:

> Title VII's prohibition on sexual harassment operates to protect employees from gender-related misconduct that disrupts job performance. A line must be drawn between actionable conduct and conduct that is merely insensitive, tasteless, or vulgar. Title VII's mandate is not to ensure workplace harmony or create a finishing school. A hostile work environment requires conduct so "severe" or "pervasive" that the very terms of one's employment are altered.

*Id.*

In her response, Gonzales asserts many of the same facts to support her claim of a hostile work environment, as she used to support her claim for retaliation. Specially she claims that after she reported the sexual harassment, Stephen Archuleta would no longer speak to her in her office, that Mr. Flores and members of the maintenance crew under Mr. Flores began to physically keep their distance from her, and that she was no longer greeted with hugs. (Doc. 53 [Pl's Opposition] at 20-21). Brent Jaramillo, the Deputy County Manager, told her to be careful where she talked to people because it would look bad and told her not to take breaks in the plaza square of the County Courthouse and not

to go to lunch with her staff, or if she did to take a separate car. (*Id.* at 21). Gonzales also claims she was accused of having an affair with a County Commissioner because she was sitting with him in his vehicle, but as the Court previously mentioned, this event occurred in 2012. (See Doc. 45-6).

Even taking all of Gonzales's claims as true, these complaints do not support a claim for a hostile work environment. None of the traditional allegations of a hostile work environment based on gender are present in this case. If anything, Gonzales's complaints are that her co-workers were too careful NOT to engage in inappropriate workplace conduct. They kept a distance, conducted their conversations in the open, and did not hug. This is not the type of behavior that rises to the level of a hostile work environment. Additionally, the allegation that Gonzales was having an affair occurred in 2012 and appears to be an isolated incident during that time.

For all of these reasons, Gonzales failed to assert a claim for a hostile work environment based on gender. Gonzales's Claim in Count Five for Hostile Work Environment is DISMISSED.

### 3. Disparate Treatment (Count Four)

Gonzales also makes a claim for disparate treatment under Title VII. In her Amended Complaint she claims that Defendants subjected her to adverse employment actions because of her sex and that they treated her less favorably than similarly situated male employees. (Doc. 15 [Amended Complaint]).

Cordova terminated Gonzales after two separate events that occurred in December 2015. While the parties' interpretation of these events varies, the undisputed facts and

the facts in the light most favorable to Gonzales are as follows. On December 18, 2015 there was an incident in the detention center. Prior to this time, the Adult Detention Center (ADC) implemented "tier time", which allowed inmates on each of the two floors out of their cells at separate times, but required them to be in their cells when the other floor was out. Gonzales implemented tier time based on safety concerns for officers and inmates. Prior to December 18, 2015, inmates were agitated about the use of tier time. On December 18, 2015, Detention Officer Matt Tafoya called a Code 1 at approximately 12:45 p.m. after discovering inmate Espejo's face was covered in blood. Tafoya called for the inmates in A pod to go on lockdown, but they refused. Lt. Zamora, arrived to find the inmates yelling and saying they were not going to do tier time anymore. Both Zamora and Tafoya questioned Espejo, who claimed he had slipped and fell. The staff were outnumbered, and they were physically not able to lock down the inmates. Gonzales made the decision to go and speak to the inmates herself. Gonzales did not regularly go back to the actual pods, because she had been informed by Zamora and others that her presence undermined their authority.[7] It appears undisputed that Gonzales was only back in the pod area with the inmates 4 or 5 times while she was the director. Gonzales conferred with Zamora about allowing the inmates one chance to prove they

---

[7] Lt. Zamora testified that she thought Gonzales should have been in the back (the pod area) more. (Doc. 45-13 at 2 [Zamora depo. at 28]). However, for purposes of summary judgment the Court views the facts in the light most favorable to Gonzales, that she was told by Zamora not to go to back to the pod area.

could behave without the tier time, and Zamora agreed.[8] Gonzales spoke to the inmates and agreed to abolish tier time.

Gonzales testified that she recognized it was a possibility that Espejo was injured in a fight at the time she took the inmates off tier time. After the event on December 18, 2015, Gonzales did not receive the investigation report from that incident until the 22nd, at which time it was confirmed there was a fight. (Doc. 45-1 at 24 [Gonzales depo. at 172-173]). Gonzales asked Lt. Olvera what she was going to do about the situation and Lt. Olvera stated "nothing", that it was too late to punish the responsible inmates. (Doc. 45-1 at 25 [Gonzales depo. at 175]).

Then on December 23, 2015, inmate Jonathan Lopez was assaulted and was transported to the hospital for treatment. Gonzales was not informed of the assault on the day it happened. (Doc. 45-1 at 26 [Gonzales depo. at 179]). She was not advised of the incident until December 28, 2015. (*Id.*). Gonzales blames this failure on Lt. Olvera. (*Id.* [Gonzales depo. at 180]). Gonzales called in Lt. Olvera on that day and asked what was going to happen to the inmates that were involved and Lt. Olvera again stated that nothing was going to happen, that it was too late. (Doc. 45-1 at 27 [Gonzales depo. at 196]). Lt. Olvera also joked that she had "green lighted" Lopez's beating. (Doc. 45-1 at 28 [Gonzales depo. at 198-199]). Gonzales then took the matter to Deputy County Manager Brent Jaramillo to discuss it. (Doc. 45-1 at 29 [Gonzales depo. at 202]).

---

[8] Lt. Zamora testified that Gonzales never made any contact with Lt. Zamora prior to talking to the inmates. (Doc. 45-13 at 11 [Zamora depo. at 140]). However, for purposes of summary judgment, the Court accepts Gonzales's statement that she spoke with Zamora who agreed to taking the inmates off tier time.

On December 28, 2015, Gonzales and Lt. Zamora notified Deputy County Manager Brent Jaramillo of the inmate fights of December 18th and 23rd. (Doc. 45-17 at 2 [Jaramillo depo. at 25]). At that time Gonzales informed Jaramillo of the possibility that Lt. Olvera had greenlighted a hit on Lopez. (*Id.*). Jaramillo consulted with legal counsel and told Gonzales to move Lopez to another facility. (Doc. 45-17 at 3 [Jaramillo depo. at 26]). Jaramillo was concerned that he was not informed of these events until ten days after the first fight. (*Id.* [Jaramillo depo. at 28]). Jaramillo then shared this information with County Manager Cordova. (Doc. 45-17 at 4 [Jaramillo depo. at 37]). Cordova was also concerned they had not received this information sooner. (*Id.*; Doc. 45-9 at 10; Cordova depo. at 150]).

Cordova decided to terminate Gonzales on January 7, after thinking about their meeting on January 4, 2016.[9] Cordova was concerned about the lack of information they had been provided regarding the events, and he also had concerns about issues with the breakdown of the chain of command between Gonzales, Lt. Zamora, and Lt. Olvera. (Doc. 45-9 at 9 [Cordova depo. at 86-88]). Specifically, the Notice of Termination cited numerous meetings to discuss Cordova's disappointment with Gonzales's failure to meet expectations. (Doc. 45-9 at 15 [January 8, 2016 Notice of Termination]). The Notice stated that in the last 30 days Gonzales failed to take appropriate steps in response to critical incidents in the facility, or to advise management of the incidents in a timely manner. (*Id.*). The letter went on to explain that when these incidents were brought to

---

[9] Cordova's deposition pages related to the January 4, 2016 meeting appear to have been omitted from the filing. Defendants cite to page 216 of Cordova's deposition, but that page is not provided.

the attention of the Deputy County Manager, he took action that the Director should have taken.[10]  (*Id.*).  The letter also cited the lack of a report and communication regarding these incidents. (*Id.*).

Against this factual background the Court will consider Gonzales's disparate treatment claims.  Gonzales's claim appears to have two parts, first that male directors of other departments were treated more favorably than her and that her replacement, Nelson Abeyta was also treated more favorably than her.

The Tenth Circuit has explained:

> Under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the plaintiff bears the initial burden to establish a prima facie case of sex discrimination, which varies depending on the type of adverse action the employee alleges was discriminatory. See *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) ("[T]he articulation of a plaintiff's prima facie case may well vary, depending on the context of the claim and the nature of the adverse employment action alleged.") In this context, a prima facie case of discrimination must consist of evidence that (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination. *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 (10th Cir. 2005). Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1311 (10th Cir. 2006). If the employer does so, the burden shifts back to the plaintiff to show that there is a genuine issue of material fact as to whether the employer's proffered reasons are pretextual

*E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007).

---

[10] Brent Jaramillo testified that during his meeting with Gonzales on the 28th, he directed her to gather statements and to get him an initial report on the incident. (Doc. 53-3 at 3 [Brent Jaramillo depo. at 26]).

First Gonzales's claims that two male directors were provided progressive discipline and "coaching", while she was terminated without any progressive discipline. As discussed above, Gonzales claims Cordova utilized "coaching" and progressive discipline in writing up Solid Waste Director Deward Martinez and Public Works Director Earl Salazar.

Cordova testified that Solid Waste Director Martinez had two instances where he took his county vehicle home without prior approval and was given a write-up for those actions. (Doc. 53-2 at 7 [Cordova depo. at 166]). This instance is completely distinct and different from the events that led to Gonzales's termination and does not establish a basis for disparate treatment claim.[11] The other instance was a public works supervisor who also took county property home for personal use. (*Id.* [Cordova depo. at 168]). Both of these individuals were provided "guidance and coaching" as to county vehicles and when they could be taken home. (*Id.*). There were other issues with Salazar, he had problems with his chain of command and he was demoted. (*Id.* at 8 [Cordova depo. at 172-73]). However, he was later terminated after there was a substantiated claim of sexual harassment. (*Id.* at 9 [Cordova depo. at 177]).

While Cordova handled Salazar's discipline in a different fashion than Gonzales's, they were not similarly situated employees. While they were both director level employees, Martinez was involved with public works, while Gonzalez was involved with corrections, where she was responsible for the safety of both inmates and correction

---

[11] If Gonzales was terminated for two instances of taking home County property without prior approval, this would be an appropriate comparison.

officers. As a result, the Court finds that Salazar was not a similarly situated employee. Additionally, as the Court previously noted, Gonzales failed to provide any competent evidence to compare these two events. There are no employment records for Mr. Salazar or evidence other than Cordova's memory as stated in his deposition. Gonzales has the burden of providing some evidence for the Court to find that Mr. Salazar and Gonzales were similarly situated. There is no such evidence in this case.

The final issue is Gonzales's claim that the current male Detention Director Nelson Abeyta has been treated more favorably than her. Specifically, Gonzales points to the fact that in July of 2016, there were two inmate deaths, one as a result of a suicide and the other as a result of a drug overdose. Gonzales also claims that under Abeyta's watch there was a fight that resulted in inmate injuries, which was not immediately reported. Gonzales claims that there was no disciplinary action taken against Abeyta for any of these events.

First, it is important to note that the basis for Gonzales's termination was not that the fights occurred. It was Gonzales's lack of communication, both from her staff to her, and from her to the County Manager. Additionally, it is undisputed that by January 8, 2016, Gonzales had failed to provide Jaramillo or Cordova with a report from either incident. Even in her response to the motion for summary judgment, Gonzales blames Lt. Olvera, without acknowledging her responsibility as Lt. Olvera's supervisor for Lt. Olvera's actions and failings.

With that in mind, after the inmate suicide on July 16, 2016, Abeyta provided Cordova with a written report on the same day. (Doc. 53-13 at 39 [July 16, 2016 Incident

Report]). In the report, Abeyta explained what occurred, the steps that were taken to determine what had happened, including calling the Sheriff's office to investigate. (*Id.*). Abeyta conducted interviews with other detainees from B-pod and completed an incident checklist. (*Id.*). There was an issue with the time of patrol and the County tightened up that issue, and according to Cordova, they were able to avoid other suicides. (Doc. 53-2 at 14-15 [Corodva depo. at 225-226]). Cordova talked to Abeyta about corrective action, including additional training for the staff, who had not been properly trained previously. This was not corrective action for Abeyta and his management style or his lack of communication, but rather action the staff could take to avoid future events of this nature.

Abeyta's actions were also the same for the overdose death on July 28, 2016. Abeyta provided Cordova with a written report on the same day of the incident. (Doc. 53-13 at 43 [July 28, 2016 Incident Report]). In the report, Abeyta explained what occurred, the steps Abeyta took to determine what had happened, including calling the Sheriff's office to investigate and take samples. (*Id.*). Abeyta also indicated that they were pulling video to determine the last staff and detainees that the inmate was seen with and reported on the results of the surveillance videos. (*Id.* at 44-46). Abeyta conducted interviews with other detainees from B-pod and completed an incident checklist. (*Id.*). Abeyta also ordered a shakedown of the facility and reported finding heroine on one of the inmates, which was turned over to the Sheriff's office. (*Id.* at 45). Also, on the same day of the second death, Lt. Zamora provided Cordova a report regarding the incident. The way Abeyta handled the July incidents was distinctly different from Gonzales's handling of the December incidents.

Gonzales also claims that there is an investigative report by Sheriff Hogrefe that Abeyta suspected that the inmate had drugs in his cell the day before his death and that he had done nothing in response to that information and was not punished for this fact. (Doc. 53-13 at 62-63). Sheriff Hogrefe's report states that "[s]ubsequent to this death investigation there was a suspicion that illegal drugs may be in the facility. A search of the facility was done. . . ." (*Id.*). The Sheriff also reported that the night before the overdose death, on July 27, 2016, there was information that there were drugs in the facility, and that information was passed to Abeyta by an inmate and when Abeyta was questioned about it by the Sheriff, Abeyta confirmed he received information from an inmate that another inmate had brought drugs into the facility, but he was not certain it was credible information. (Doc. 53-13 at 64-65).

Cordova stated that he had concerns about the overdose and that he had conversations with Abeyta about it. (Doc. 53-2 at 16 [Cordova depo. at 231]). Additionally, he stated that he was satisfied with the follow-up and was comfortable with the corrective action going forward. (*Id.* [Cordova depo. at 232]). Again, this is corrective action for the overall better operation of the detention center, not corrective action related to Abeyta's leadership or handling of the matter.

The manner in which Abeyta handled these incidents is different and distinct from Gonzales's handling of the December fights. Abeyta's staff informed him of the incidents immediately, he took steps to insure an investigation was completed, and he provided timely (same-day) incident reports to Cordova. The Sheriff's Office was brought in as part of the drug investigation, as shown by the report from the Sheriff's

Office. This is significantly different than how Gonzales handled the December 18 and 23, 2015 fights, where she still had not provided Cordova with incident reports by January 8, 2016 and no corrective action was taken after either event.

Additionally, Gonzales cites to an incident where one or two inmates punched another inmate, who then went to the medical department on May 2, 2016. (Doc. 53-13 at 1-10). The same sheet indicated that on the same day two detainees were placed in lockdown after Lt. Zamora reviewed the video footage. (*Id.* at 2). However, there is not sufficient information to indicate that the issues related to this incident are in anyway like the issues with Gonzales's handling of the December incidents. Additionally, the Court would note that while it is not clear exactly when Abeyta became the Director of the Detention Center, this event occurred very early in his tenure.

At oral argument, Gonzales's counsel also claims that there is also direct evidence of discrimination in this case in the form of text messages from Lt. Zamora to Gonzales on an unspecified date, where Lt. Zamora claims: "It's kind of sad cuz they didn't even give us any credit cuz we're women" and "I did let the county manager know that they set u up for failure . . . ." Doc. 53-11 at 1. These statements from the text messages are completely without context. However, in her deposition, Lt. Zamora was asked about her statements and she stated that the inmate clientele treats them differently. (Doc. 53-5 at 7 [Zamora depo. at 102]). She stated you could do something good and it would go unseen, more for a woman than for man. (*Id.*). When asked if she thought in Taos County a woman had to work harder to be recognized than a man, Zamora stated that she had never been in that position of having to answer to the commission and all the other

people, she just did her job. (*Id.* [Zamora depo. at 104]). When asked again if the administration and inmates both make it more difficult, Zamora replied "I said just the inmates." (*Id.* [Zamora depo. at 105]). She was then asked about the administration, but that answer was not included in the exhibit.

However, these statements are not direct evidence of discrimination. They are not statements by Taos County policy makers that they are going to treat women differently or more poorly than their male peers or that they do not value women's work. Rather, these statements are from Gonzales's subordinate, and apparently supportive friend, making a vague and general statement about unspecified people. There are no specific instances of conduct, only generalities. This is not proof of discrimination.

For all these reasons, Gonzales failed to show that she was treated differently than Abeyta or any other similarly situated male employee. As a result, Gonzales has failed to assert a question of fact for the jury related to her claim for disparate treatment. Gonzales's claim in Count Four for Disparate Treatment is DISMISSED.

### E. Violations of the Equal Pay Act (Count Eight) and New Mexico Fair Pay for Women Act (Count Nine)

Gonzales also claims violations of the Equal Pay Act ("EPA") and the New Mexico Fair Pay for Women Act ("FPWA"). Theses statutes are similar and given the lack of direction on the interpretation of the FPWA, the Court will review them under the same standard.[12] Gonzales asserts that at the time of her termination the County paid her

---

[12] Compare N.M. Stat. Ann. § 28-23-3(A) (FPWA prohibiting discrimination "between employees on the basis of sex by paying wages to employees in the establishment at a rate less than the rate that the employer pays wages to employees of the opposite sex in the establishment for equal work on jobs the performance of which requires equal

$32.81 per hour or $68,828 annually. However, the County paid her male replacement $36.54 per hour or $76,320.00 annually.

The EPA provides:

> (d) Prohibition of Sex Discrimination
>
> 1. No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payments are made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex; *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1).

Claims based on the EPA do not follow the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-07, 93 S.Ct. 1817 (1973). Rather, EPA claims use a two-step evaluation process. First, a plaintiff must establish a prima facie case of discrimination. Once the prima facie case is established the burden of persuasion shifts to the defendant to prove that the wage disparity was justified by one of the four permissible reasons set forth in the EPA. *See Michelson v. New York Life Insurance Company*, 460 F.3d at 1311; *Riser v. QEP Energy*, 776 F.3d 1191, 1196 (10th Cir. 2015).

---

skill, effort and responsibility and that are performed under similar working conditions") with 29 U.S.C. § 206(d)(1) (same).

Gonzales must show the following items to establish a prima facie case under the EPA:

1. She was performing work which was substantially equal to that of the male employees considering the skills, duties, supervision, effort and responsibilities of the jobs;

2. the conditions where the work was performed were basically the same; and

3. the male employees were paid more under such circumstances

*Riser v. QEP Energy*, 776 F.3d at 1196, *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1363 (10th Cir. 1997).

Defendants argue that Gonzales's claim fails because she is not seeking to compare herself to a contemporaneous employee, but rather to a subsequent employee. The Court does not find this argument controlling. "The law is clear that an Equal Pay Act violation may be established even though employees whose pay is the subject of comparison perform substantially equal work at different times." *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1467 (10th Cir. 1992).

Additionally, Defendants claim the Detention Director position was revised on February 2, 2016. (Doc. 45-4 at 28). The position added the requirements of: "Observes conduct and behavior of inmates to prevent disturbances and escapes; searches inmates and cells for contraband and articles; patrols assigned areas for evidence of forbidden activities; infractions of rules and unsatisfactory attitudes or adjustment of prisoners, and reports observations to supervisor; performs inmate supervision during recreation and meal periods." (*Id.*). Additionally, the Detention Director oversees all functions of the

PREA (Prison Rape Elimination Act) program for Taos Detention Facilities. (*Id.*). The position was also changed to being willing to work on an "on-call" basis and work an irregular schedule. (*Id.*). The "Work Environment" section was also changed to expand both the physical and mental demands. (*Id.*).

The Court finds at a minimum there is a question of fact as to whether Gonzales and Abeyta were performing the same essential work and this question of fact is resolved in Gonzales's favor at this stage. The next issue is whether Defendants established that the wage disparity was based on one of the four permissible reasons set forth in the EPA. In this case, Defendants rely on the fourth factor, "a differential based on any other factor other than sex". Defendants assert that Abeyta is significantly more qualified in the area of adult detention, justifying the increased salary.

Specifically, Abeyta had 27 years of experience in adult detention centers, including 20 years from 1987 to 2007 with the Penitentiary of New Mexico. In that location he served seven years as a corrections officer, four years as a sergeant with first line supervisory authority for 16 corrections officers, two years as a Lieutenant, with supervision over corrections officers, including Sergeants, and four years as a Captain Chief of Security with supervision over 40 Correction Officers/Sergeants/Lieutenants and the welfare of 330 to 400 inmates. (Doc. 45-20 [Abeyta Taos County Application]). From 2009 to 2016, Abeyta was the Chief of Security for the Santa Fe County Adult Detention Facility with overall responsibility for the custody of the inmates. (*Id.*).

Gonzales states Abeyta was less qualified than her because he had no experience as director of a detention facility, whereas she had six years of experience as the Director

31

of the McKinley County Detention Facility and seven years of experience as the Director of the McKinley County Alternatives to Detention Program. Ms. Gonzales also had numerous certifications and training in the administration of detentions.

These are questions of fact for a jury to decide and are not appropriate for summary judgment. As a result, the Court finds Gonzales has asserted a claim under the EPA.

Having found that Gonzales has stated a claim under the EPA, for the same reasons, she has also stated a claim under the FPWA. However, the Court must address Defendants' argument that the FPWA cannot be maintained against a government entity. This issue is currently pending before the New Mexico Court of Appeals in the consolidated cases of *Tafoya Lucero v. New Mexico Corrections Dept.*, Ct. App. 35,438, Dist. Ct. No. D-101-CV-2013-03206 (Briefing Complete as of 10-7-16) and *Wolinsky v. New Mexico Corrections Dept.*, Ct. App. No. 35,762, Dist. Ct. No. D-101-CV- 2016-01005 (Briefing Complete as of 3-29-17). Both parties suggest that the Court should reserve ruling on this issue until the New Mexico Court of Appeals issues its ruling. The Court has some concerns about waiting, because there is no indication of when Court of Appeals' ruling will come. Additionally, it appears there is some potential for further review of the Court of Appeals' ruling before the New Mexico Supreme Court, regardless of the outcome.

However, the reach of the FPWA appears to be an issue of significant state importance, including issues of state sovereignty. Additionally, there is no guidance from any other Court on how to address this issue and Gonzales has not provided the

Court with any argument on this issue. For these reasons, the Court will reserve ruling on this issue.

## F. Municipal Liability (Count Six)

The Court is not certain the exact nature of this claim. However, based on the Court's findings that the County did not engage in any improper or prohibited conduct under § 1983, the Court finds this claim also lacks merit and Gonzales's Claim in Count Six for Municipal Liability is DIMSISED.

As it relates to Gonzales's claims under the EPA and FPWA, these claims are against Taos County as her employer and municipal liability is not an issue for these claims.

## II.    CONCLUSION

For all the above stated reasons, the Court finds Gonzales failed to establish a contested issue of material fact on her § 1983 claim, her Title VII claims, her state law breach of implied contract claim, and violation of New Mexico Human Rights Act claim. The Court finds Gonzales has asserted a claim for violation of the Equal Pay Act. The Court reserves ruling on whether Gonzales may bring a claim under the New Mexico Fair Pay for Women Act.

IT IS ORDERED that Defendants' Motion for Summary Judgment is GRANTED for Gonzalez's claims for Retaliation in Violation of Title VII - Count One; Violation of New Mexico Human Rights Act -Count Two; 42 U.S.C. § 1983 Due Process Violation – Count Three; Title VII – Disparate Treatment – Count Four; Title VII – Hostile Work

Environment; Municipal Liability – Count Six; and Breach of Employment Contract – Count Seven. These claims against Defendants are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment on Plaintiff's claim for violation of the Equal Pay Act – Count Nine is DENIED.

IT IS FURTHER ORDERED that Defendants' Motion to Dismiss Plaintiff's claim for violation of the New Mexico's Fair Pay for Women Act – Count Eight is RESERVED.

IT IS FINALLY ORDERED that the Court will hold a status conference to discuss how the parties would like to proceed with this case on Monday, August 6, 2018 at 10:30 a.m. The parties should call into chambers on one line at 307-433-2190. The parties shall confer prior to the conference to determine if there is a consensus on how to proceed. The parties shall file a status report on or before Friday, August 3, 2018.

Dated this _____ day of August, 2018.

NANCY D. FREUDENTHAL
CHIEF UNITED STATES DISTRICT JUDGE